Good morning, your honors. May it please the court, Natalie Kalbachian of Loyola Law School's Ninth Circuit Appellate Clinic, under the supervision of attorneys Mary Christine Sangaila and Paula Mitchell, on behalf of the petitioner Mario Rajiv Flores Molina. I will discuss asylum and upholding for eight minutes, and my colleague Tina Kwong will address cat protection and reopening for seven minutes. We would each like to reserve two minutes for rebuttal. Go ahead. Thank you. Mario Molina is a blacklisted political dissident from a country that, according to the U.S. State Department, is still governed by the Sandinista regime that maintains a policy of exile, jail, or death for its political opponents. After participating in the April 2018 protests, Mario received a series of escalating threats from government operatives, starting with online posts and a spray-painted message on his home, and finally materializing as an armed home invasion and a physical beating. Reversal of the BIA's denial of Mario's asylum and withholding claims is required because of the agency's failure to take into account key evidence on both past persecution and future persecution. For past persecution, the BIA, one, omitted the death threat contemporaneous with Mario's November 2018 beating at the Two, characterized as a visit, a late-night raid by paramilitary for Mario at his home with drawn assault rifles on his roof while he hid from them in his own yard. And three, failed to consider that all of these events together compel finding a past persecution. On the matter of well-founded fear of future persecution, your honors, the BIA ignored U.S. State Department and other human rights reports in favor of two discreet news reports that mentioned only examples of the government's limited release of political prisoners. The full record, including the comprehensive country reports and other recent news reports ignored by the agency, compels the conclusion that returnees like Mario are likely to continue to face persecution in the future. Could I ask you a quick question? Who authored those articles? Uh, the, uh, which are, the articles, uh, on- I believe. Yes. Who, who, did, how did, did you, did the petitioner author them? Uh, no. I'm sorry. The news agency did. Are you, uh, your honor, are you referring to the two articles, the May 2019 articles on which, yes, they're authored by news agencies. By who? Uh, news, uh, uh, Reuters and Washington Post. No, no, but who put them in evidence? Um, the, uh, the DHS. May I proceed? No, I'm sorry. I apologize. I didn't realize it would take so long. Oh, I'm sorry, your honor. Um, in its decision, the agency ignored much of the past conduct that amounted to persecution, and it was indisputably done at the hands of the government. The BIA denied the threats leading up to the beating Mario experienced were especially menacing, failing to properly characterize them as death threats. The final expressed death threat in November was a culmination of a series of other escalating threatening activity, from being included on, on an online blacklist of political dissidents with the caption, Chipotle awaits, the prison, uh, that the State Department, uh, reports referred to, to bullets to strikers being spray painted on the walls of his home, and, uh, armed paramilitary members. Oh, I, you say that the BIA ignored this stuff, but, you know, I'm looking at the BIA opinion decision here, and it says that, talks about Sandisa youth beating and threatening him, spray painting a threat on his residence, um, and, and, and then it actually says he lost a tooth and cuts, bruises, and a scar, and so, it seems to me, it's a, it, it, are you saying that they needed to have said that they beat him and made a death threat, I suppose, because it does say they threatened him, and they do cite to his brief, to which I assume said that it was a death threat, it just seems like you're parsing it pretty, pretty thin in saying that, that they ignored things when, when, you know, they have a list here of, of all the things you're talking about, they just don't, they don't go into all the detail you're saying. Well, I mean, well. Well, uh, they do omit a key piece of the incident, the discreet incident to which you referred to, which is the contemporaneous death threat, and this court has found that that alone. Counsel, do they admit it? I mean, they, they, they do say that they threatened him. They, they don't use the word death threat, but they say threatened him, so I'm not sure that they admitted it. Is that right? Um, in the BIA's decision, when they, uh, discussed the beating, um, I believe that they've omitted that death threat from the, um, consideration, so that's, they do refer to the threats leading up to the beating, but not the threat, uh, in tandem with the beating. It says, it says, in November 2018, Sandista Youth beat and threatened him, and so it just doesn't say that they beat him and threatened him with death, I guess, but it, it says they threatened him, so they're referring to the threat, I think, and you're saying that the fact that they didn't mention death is, you say, omitted that, even though they referred to the threat. Well, that, that is a key omission because, uh, previously the BIA has characterized the threat as potentially menacing, and a death threat is the most menacing type of threat that one could receive, and, uh, dropping that from the analysis when they have all these different details about the other incidents is erroneous. The, because this court has found in itself that one incident of a death threat in conjunction with, um, other forms of abuses, like a physical beating, amounts to persecution in Smolniakova versus Gonzalez, so dropping that from the analysis is important. So it's not a matter of semantics that they didn't go into great detail, but the BIA is, um, obligated to at least, um, address things that this court has found, uh, alone amount to persecution. You know if it's true that, because we can't reverse the BIA unless, unless the record tells a different conclusion, right? Yes. And so, you know if it's true that, that if you have a death threat and a beating, that it has to be persecution, you see what I'm saying? Like, I understand your point that, you know, there's a theory of ban of, that the agency has a certain amount of discretion, and so, within that ban, we don't overturn it. So I hear your point that a death threat and a beating could be persecution, but that's, that's, you have, it has to be a death threat and a beating, um, it has to be one of two things. Either they, they err by not addressing the death threat, which I think is tough because they actually do say that he was threatened, they just don't use the word death. But, or, or your argument could be that it has to be a, uh, that if there's a death threat and a beating at the same time, then it has to be past persecution. Is that your argument? That it has to be? Well, our argument is two-fold, Your Honor. One, they downplay the threats leading up to the event when they're all, uh, they are all death threats in nature and in context, and including the death threat, um, uh, against him during the beating. So that downplaying is, uh, is I guess a key omission. And second, yes, our argument is that this combination of events has been found to amount to persecution by this court, um, affirmatively by this court in Smolniakova v. Gonzalez, where, uh, this court has stated that a death threat in conjunction with other forms of abuses requires a finding of past persecution. So, that in mind, uh, that omission or at least downplaying the severity of the threats, um, is enough to, um, uh, find a remand or compel that the substantial evidence requires, um, the opposite conclusion. But they just, you know, the, the, but BIA just denied his, his claim on past persecution. Is that right? I mean, and future persecution. Yes. They, they denied on both elements. They, they didn't reach the other elements of, uh, asylum and withholding. Right. They stopped their analysis for the most part at, um, whether the, um, the incidents rose to the level of persecution. Okay. Yeah, you're going to share time with, I believe it's Ms. Quang, Quang? Quang. Yes, Your Honor. And, and for those reasons, the, the substantial evidence, um, compels, uh, the totality of experiences compel, um, I, a remand. Okay. I'm going to adjust the camera a little bit. May it please the Court, Tina Quang of Loyola Law School's Ninth Circuit Appellate Clinic on behalf of Petitioner Mario Rajiv Flores Molina. As my colleague mentioned, I am discussing Mario's motion to reopen an application for Convention Against Torture or CAT relief. CAT prohibits the government from removing an individual to a country where it is more likely than not he would be tortured by government actors. Torture is more severe than persecution, but CAT relief is analytically separate from claims for asylum and withholding, and all evidence... Let me ask you this. If we were to agree, uh, or conclude that, uh, there was error here and we granted relief on the first petition, this would, this second petition would be moved, wouldn't it? Um, sorry, which petition are you talking about being the, being the second? Motion to reopen is the second one, right? Mm-hmm. So if you were to get, Petitioner were to prevail on the first petition that we just heard argument on, right? Mm-hmm. If you were to prevail on that, wouldn't this petition, the second petition, basically be moved? Mm-hmm. So what we're requesting is this Court remand to the BIA first to exercise its discretion to consider the second petition and whether to reopen so that Mr. Molina can be afforded the opportunity to pursue an adjustment of status with USCIS while seeing if they should stay the asylum withholding and CAT claims pending USCIS's adjudication of his application. What is the status of that application? I mean, has, has it, has, you know, the, the, I guess it's the I-30 that he wanted to file, but some time has gone by. No status of it is right now. Yeah. So we sent a letter to the Court. Mr. Molina's green card was recently denied by USCIS, but he submitted timely motions to reopen and reconsider. So the denial is not final. The grounds for denial was that there was no showing of his lawful admission or parole into the United States, but Mr. Molina properly presented himself at a port of entry and has now been paroled. So in other words, released from detention and the denial was on no other grounds. Well, counsel, can I, I want to ask you about that. I feel like maybe you drew the short straw a little bit on having the motion to reopen part of this argument, because I'm a little disturbed at the very end of his opening brief. Petitioner's opening brief said there's nothing. His argument was to us that the only thing standing in my way of getting relief from USCIS was the agency not granting this motion to remand. And that's what you said in your opening brief. On page 66, you repeatedly said there's nothing that would disqualify him in his visa application from obtaining his change of status. And then you spent three pages of your opening brief saying there's nothing to disqualify him. But then you had the awkward, you did the best you could with the letter you sent us, but then you sent us a letter that said, well, actually you see USCIS denied it, but we're going to, we're going to seek reopening. And they didn't deny it for the reason that you said that they would be the only reason they would deny it, which was, would be that he, he had a, a removal order that hadn't been stayed. Not because they had asked you for evidence about his lawful admission or parole. And you provided two documents, right? You provided, you did, you know, when somebody asked for evidence, usually they want like, they want evidence, like something showing that he was lawfully admitted or paroled. What you provided was two documents that you thought supported that he had been lawfully admitted or paroled. 2007 USCIS inter-office memorandum and an advice practice advisory. But those are basically arguments that he, and the USCIS rejected those arguments essentially. But now he's been released. So the problem, the problem is, is it wasn't really true what you told us in the opening brief, I don't think, right? When you said that there was nothing in his visa application materials to USCIS that would disqualify him. USCIS didn't agree with you. They disqualified him because they didn't think that he had been lawfully admitted or paroled, which is a requirement. So that's a problem. I mean, that's a, that's a little bit of a, a little bit of a candor issue as far as like you told us there wasn't a problem. There was nothing in the way, but then there was. And you knew about that because two weeks before you filed your opening brief, you actually had gotten the request from USCIS asking for this evidence. Well, Your Honor, we are working separately for this appeal than the immigration lawyers that are taking care of his USCIS application. And when we were going through the case, we didn't know about this. We all went through the presumption, through with the presumption that he was lawfully admitted or paroled. And even in the DHS's opposition to his motion to reopen, they said he was paroled. If you look at 2AR pages 12 and 15, they explicitly say that he was paroled into the United States. Okay. I'll ask about that. But in your point, now he has been, he was just released, I don't know, back in, was it in December, right? Can you tell me why? And I'll ask the government's counsel if you don't know the answers. But why was he released? It has something to do with, is there some rule that they can only hold him for so long? Once there's a final order of removal, they can only hold him for so long, and then they have to release him? Is there some rule about that? We are not entirely sure why he was released from parole. And it's unclear from the record before us why he was granted parole. I think the immigration court is in a better position to determine how this affects the motion to reopen and Mario's green card, which further supports remand. I'll ask the government why he's been released. I mean, it seems like now he would be being paroled maybe by USCIS, but obviously they didn't think he was until he was actually released. So I'll ask the government. Was he represented by, he was not represented by counsel before the IJ, was he? He was not represented before the IJ. So the denial by USCIS of the green card was on no other grounds. And the issue still remains that the BIA abused its discretion by denying Mario's motion to reopen for reasons contrary to law. The BIA's analysis misapplied or ignored the governing multi-factor framework required to assess continuances for adjustments of status set forth in attorney general opinion, matter of LABR. Matter of LABR tells IJs, it provides IJs the framework by which they are supposed to consider motions for continuance. Is that right? That is correct, your honor. So it doesn't, I mean, it doesn't on its face apply to the BIA. In fact, I don't, as I read matter of LABR, it has like several things that would require fact finding. Like you're supposed to look into, you know, things, but the BIA doesn't do fact finding. So I don't see how the BIA was, when you're asking for a motion to reopen at the BIA at the end of your proceedings, isn't that kind of different than asking for a continuance in the middle of your IJ proceedings? The motion to reopen is for a continuance so that Mario can pursue adjustment of status with USCIS. No, I know. I know, but the difference is, you know, you're in the middle of your proceedings in front of the IJ, right? You're kind of, you're asking for, you're asking, oh, I have a pending application. Can you please stay in my, or continue my proceedings? I mean, that doesn't matter LABR, it says you look at these various things. But if you're all the way at the end of your proceedings, and you're about ready to, you know, send back and say final order removal, you can remove the person. That's a different procedural posture than where matter of LABR applies to, right? Well, the BIA in its decision did cite matter of LABR, and they did cite what is required. That makes a certain amount of sense because you were asking them to send it back so that they would apply matter of LABR. But my point is, I'm not sure that, does matter of LABR bind what the BIA's analysis should be? I understand they have to look at it to see what would happen if it went back down, right? Because then matter of LABR would bind the IJ. But does matter of LABR bind the BIA's analysis of a motion to reopen? So matter of LABR binds the immigration court. And in this sense, the BIA isn't looking, isn't doing fact finding. It isn't looking at whether or not this affects the asylum withholding or CAT claims. It's looking at whether it affects the proceedings as a whole. And they did cite matter of LABR. They did not fully apply it, and they did not fully consider the secondary factors in applying it. Okay, we let you go over your time. So I'll give you a minute for rebuttal. All right. Thank you. All right. Let's hear from the government. May it please the court. Jeff Leist appearing on behalf of the Attorney General. Substantial evidence supports the agency's denial of the petitioner's applications for asylum withholding of removal and CAT protection. As far as asylum and past persecution, the record does not compel the conclusion that the harm the petitioner suffered, threats, harassment, and one violent encounter over a period of several months at the hands of different actors, rose to the level of persecution. The petitioner argues that this is not- Isn't it clear that they were pretty much state actors? There was a Facebook post that was threatening that was by an unknown person who the petitioner assumed was a government operative. There were the paramilitary and the police who came to his house, and there was a threatening- I thought that the BIA acknowledged that Molina received threats from officials of the Nicaraguan government. Yes, that's true, Your Honor. But they were not all the same individuals responsible. And the Sandista Youth Movement, that was the petitioner's assumption that that's who was responsible for the actual beating and the threat- That was what the BIA said, what I just read. Yes, that's correct, Your Honor. The government's not contending that they are not all part of a larger conspiracy, but it is not the same individuals who are responsible for- Well, who cares? Why is that relevant? Because it's relevant because when you're looking at the harm cumulatively, you have to look at it in the context of what actually transpired. And so it's not the same thing where it's like the same individuals coming to harass him and to violently attack him. It's different people who are doing it. So that's why it's not necessarily- Are you suggesting these are all somehow disconnected, independent actors? I'm just saying that it's not as simple as saying, you know, the same guy keeps coming around and harassing me. So they all could be linked to the government, but it's not the same individuals who are doing it. Yeah, but that strikes me as being totally irrelevant from his standpoint about whether he's being persecuted by the government. Well, I mean- If I'm arrested and beaten by a police officer today, and then the next day there's another police officer that does that, what is the- I don't see the point that you're making. I was just trying to illustrate that it was not kind of a clear-cut case of the same individuals. The board did consider it as- I know that, but that's- okay, I don't want to press it, but I just want to tell you that I don't think that's particularly relevant, so go ahead. So, counsel, I didn't- I see Judge Corman's point. I didn't understand you to be saying- I mean, I think the BIA talks about threats from officials of the Nicaraguan government and such. I didn't see this as one of those cases that says the government's not involved or the government's not- As I understood it, the BIA's decision on asylum, et cetera, is that it just doesn't rise to the level of past persecution. And I understood your opposing counsel to say, well, when you have a harm, like he had, where he got beat up this one time, and you have a death threat, that the record therefore compels the conclusion of past persecution in the side of cases. Do you agree with that? If not, what are your cases where somebody was beat up and received a death threat and it was not past persecution? Sure, Your Honor. The case Samad, we cited in our brief, it's 759 Federal Appendix at 636, dealt with that very issue. It dealt with death threats in a beating, and the majority of that panel found that while it is possible that death threats in a beating may constitute persecution, it does not necessarily compel the conclusion in every single case. That was a memorandum disposition. It was. It is an unpublished decision, Your Honor. Not an opinion. It is certainly something that may be considered in this court. Let me, the one thing that's troubling me about this case is that you have to look at, as a counsel, Ms. Kabakian argued is that you have to look at it cumulatively, don't you? Correct, Your Honor. You look at it cumulatively. And if you look at the, he was forced to flee, the death threats, the beating, I don't see why this doesn't add up to past persecution. Well, I mean, the court has found in a series of unpublished cases that similar harm, you know, where it involves threats and beatings and harassment by the government does not... I'm not going to, look, I'm not going to cite any memorandum dispositions for that proposition in whatever disposition we come up with here. We have to look, what do you, what do our, what does our case law say? Our published opinions. The binding, our binding opinions. Well, unfortunately, Your Honor, there's not a lot of published case law that discusses this, what it, you know, does not rise to the level of persecution. That's why a lot of the cases that you see the agency, and in fact, this court citing to, are Gu and Hoxa and Prasad, cases from about 15 years ago where it's held that, you know, detention, interrogation and beatings, harassment and one physical assault. We've said, though, that death threats with other menacing activity essentially constitute, you know, is past persecution. You can't, our case law is pretty clear about death threats. But, Your Honor, I mean, in Duran, right? When you add other things to it, as Judge Van Dyke alluded to. Yes, Your Honor. I mean, it's, it is possible for the court to come to that conclusion. The issue is whether or not the record compels that conclusion. In this case, the board found that when you considered everything cumulatively, including the threats. I read, could I tell you that I read the board's decision? And I don't, they bookend the two words cumulatively. But they really, it's not to my mind, cumulative. Because they go through each one individually. And they understate things. And to a certain extent, they ignore things. For example, with respect to a few people coming up to his house, what he testified to was that a truck, quote, full of cops and military, paramilitary members wearing ski masks, bandanas, and military jackets and carrying AK-47 rifles arrived at his house and started looking at the door. And they asked for him by name. And they began to search the house. He described it as one of the worst days of his life. I don't see that description in the BIA's, in what the BIA wrote. He saw, I believe, a neighbor or a friend of his shot and bled to death who was also a protester. And we knew to be a protester. I mean, this is, I mean, I find this, I hate to use the word shock to conscience, but it comes close to almost that. I mean, he's afraid to go to the hospital for his injuries because there are police and paramilitary at the entrance to the hospital. I mean, we're dealing, I think the whole, this is being decided in some sort of a vacuum. We're dealing with a military dictatorship that feels threatened by widespread demonstrations and all the demonstrations are peaceful. The government response is violent. I mean, I find it hard to believe that the government actually intends to deport this fellow even if it wins this case. Why was he paroled? I suspect he was paroled because maybe somebody thought we're not going to send him back. Are we? Your Honor, honestly, I don't know. I don't know what the basis for the parole was. I mean, the only documentation that I have received was what we got in the letter from opposing counsel last week. I can certainly look into it and reach out to USCIS and provide that information, but I don't know what the basis for the parole was. Can I ask you the question that I asked counsel just at the very beginning here? If the petitioner were to prevail on the past persecution issue and has to go back for further consideration of all the other elements of asylum and withholding, doesn't that effectively move the second petition that's in front of us on the motion to reopen? I think it would essentially, Your Honor, if the case goes back. Because once it gets back to the agency, he could ask for it to be remanded to the IJ for consideration of the— Well, a couple of things, Your Honor. If it gets remanded back to the board, there would no longer be a final order of removal. Right. There's that aspect of it. He could then at that point, I suppose, seek a remand to the extent when it would be necessary. I mean, given that the application has been denied, while it's not final because there is the motion to reconsider pending, I'm not sure that there's any real basis to send it all the way back to the immigration judge. No. But, I mean, if the case is already going back, then it kind of solves the issue the same way. There were two—I just want to be clear in my own mind. The BIA dealt solely with one issue, and that is whether or not he was subject to past persecution. Correct. They didn't address, I think for understandable reasons, because it's obvious the other factors that would go into past persecution analysis. Do you concede that? Those two factors? The board did decide only based on past persecution for asylum and withholding, so it would have to consider them. I can't speak to how they would decide them if they did consider them. The CAT analysis is different, and the government would contend that the petitioner has not shown that he is eligible for CAT protection. But as far as asylum and withholding, the only basis for the board's decision was the past persecution and the well-founded fear, based off of no presumption of a well-founded fear of past persecution. So, I mean, it is possible that the case could go back, and the board could find past persecution, and then find that the presumption of a well-founded fear was rebutted. But I'm just speculating as to what could possibly happen, but the board would have to conduct that analysis. And what about he had wanted to introduce a report, I think, from 2020? Well, I mean... I take it you objected to it, but I'm troubled by the fact that he wasn't represented by counsel before the IJ, and what effect that has on the possibility of that being considered. Well, if the case goes back to the agency, he could then seek to introduce additional evidence to the extent that would be relevant to his claims of harm. But this court can't consider evidence that was not before the agency. The petitioner was not represented, but he did present evidence to the court. DHS also presented evidence. So, I mean, if it goes back for further proceedings, then during those proceedings, he would be able to presumably introduce additional evidence. If there are no further questions, the government requests that the petitions review be denied. Thank you, Mr. Leith. Okay. Back to the petitioner. Ms. Blotkin? Yes, Your Honor. In response to the government's statement, I would like to reiterate that cumulative analysis is required by the BIA. The BIA should not have divorced these events from one another, as Your Honor stated. And the BIA also cannot divorce this situation from the larger context. So, Judge Corman, you gave the government's attorney a little bit of a hard time for the BIA having sort of talked about each of the issues independently. It's sort of a damned if you do, damned if you don't kind of thing going on here, right? Like, if the BIA, if it doesn't talk about them all individually, then that means they didn't, you're saying they didn't. In fact, they said threats but didn't use the word deaths, so that wasn't sufficient from your perspective. But that's the challenge with the cumulative analysis. I mean, it's hard to sort of document how you do a cumulative analysis. They said they did a cumulative analysis. They talked about all the issues. How did they not do a cumulative analysis? Well, by not drawing a through line between all these incidents that individuals in Nicaragua who are similarly situated have experienced, including political vandalism, raids, possibly being dragged to prison and beaten up. By not drawing a through line, it seemed as though they were divorcing each incident from one another and also downplayed the language. You're saying they, I don't know what you mean by, you say a through line? Yes, a pattern in the persecution that was not found, that if they look at the broader context. By not reaching the result that they cumulatively, I mean, they talked about all the issues. They said they did a cumulative analysis. They just reached a different conclusion. I think your answer is basically, well, because they didn't reach the conclusion, they didn't weigh things the way that we wanted to weigh them, that means they didn't look at them cumulatively. Well, the next logical progression in the violence, your honor, is that he would be killed. The parting threat he was given was that we're going to kill you next time we find you. And so there's no indication like that. I hear what Dave is saying. If I'm correct, this is the case that has the IJ looking at the article saying the most recent. You're saying there's a trend like this and it's going to keep going. And the IJ said, I think the IJ and the BIA said, yeah, there's a trend, but it seems to which happens, right? Like sometimes sometimes things get worse. But throughout the history of mankind, they don't always get worse. Right. Sometimes they and the ideas of the latest stuff we've got is that things aren't necessarily getting worse. Now, I don't know what's happened since then. It's not in the record. But but I don't know that he necessarily erred in saying the latest thing we chose that the regime is backing off a little bit. Well, Your Honor, things do change, but this authoritarian government has not. And the 2018 report, as well as other reports. I mean, I would be surprised if it wasn't. What I'm saying is. Well, if I could address, Your Honor, that the two news reports, I would like to address that for future persecution. Sorry for talking over you. I apologize. I think I understand. I understand what the news reports are. I think the other judges understand the news report. My point is just that I read them a certain way and said, I think that they're going a certain. That is some evidence in the record that is inconsistent with your theory that it's headed up and up direction. And it just keeps keeps keeps on going. Well, there's no indication in the in the full record that there it is going up and up. There's no indication. The fact that after a year of pressure from the international community, there has been some limited release of prisoners does not speak to or address the petitioner's specific fear of being killed or seriously harmed upon return. The only news articles or information we have on the record is that returnees are either disappeared or form some or face some other abuse upon return. So, in fact, if one steps back and doesn't just look at the two news reports that paint a rosy image, they would see that there's other forms of abuses not addressed, such as the criminal. Wait a minute, wait a minute. So it doesn't just look at the news reports. The news reports are some evidence in the record, right? Remember, it's substantial evidence. So basically you're saying they erred by relying on those. Excessively relying on them. So we don't dispute that that's true, that there has been some improvement. But that doesn't mean that when you look at the broader context, that there has been improvement for everyone. Some people got lucky, but in fact, in those news reports, the author concedes that the opposition and the government don't even agree on the number of... I understand. What you're saying is that you read them differently, you read the evidence differently. But again, we have our case logs pretty clear about that. At the end of the day, we don't get to like three way compared to the agency. I mean, I think at the end of the day, the agency's weighing has to be... that record has to compel a different conclusion. Well, it's not only my argument, Your Honor, it's the argument that's compelled, it's the conclusion that's compelled by the cumulative record. In that this court has not relied upon two isolated news reports when this court has found that country reports are the most reliable source about foreign countries. So to completely ignore the trend of Ortega government of lying to the international community about its resolve to de-escalate violence, that is an error in of itself that should have at least been acknowledged instead of just relying on the two 2019 reports when just two weeks before that, there was an acknowledgement that returnees that were deported, returnees like Mario, were disappeared. And so to not acknowledge that is a mistake, and that's why this should be remanded so that they can look at it. Okay, Ms. Koloki, thank you. I just wanted to ask one more question. The critical newspaper article is from the New York Post, and he's not represented by counsel. Who knows whether this is admissible, or even the New York Times for that matter? I mean, they make mistakes all the time. And that's why this court— I mean, there's a serious question here as to whether he had the competent assistance of counsel before the IJ, when these so-called critical documents were even admitted, which may not have been admissible if he had a competent lawyer to argue with. Yes, he was pro se before the IJ, Your Honor. And that's why, Your Honor, this court has heavily relied upon State Department reports, as they're comprehensive. Instead of just talking about one form of abuse, which is holding political prisoners, there's a wide array of abuses that he could face that are not addressed in those news articles. Okay. Thank you for this opportunity to be heard, Your Honors. Thank you. Ms. Cohen, I'll give you just one minute. Thank you, Your Honor. I'd just like to quickly address Judge Corman's question about the reports that were entered into evidence. So Mr. Molina did object to it, but he was told that the immigration judge told him that it would just be considered, and the evidence would be weighed. So he did object to the articles himself. I know, but this is a lay person making an objection without the benefit of argument, to say this should never be admitted because who could rely on them? Right. Again, he did try to object, and the court said it would properly weigh the evidence. However, the only thing the BIA cited was to the articles that were entered and not to the more probative country reports, such as the U.S. Department of State's country reports. That is also why we respectfully request that Catt be remanded, because in those reports contains evidence that political dissidents involved in the April 2018 protests, like Mario, are likely to be tortured by government actors for speaking out against the Ortega regime. Okay. Thank you, Ms. Cohen. Thank you. With that, we'd just like to express our appreciation to the Loyola Law School Clinical Program for participating in the Court's pro bono program. Thank you very much. We lost counsel for the government. Where's counsel for the government? There he is. Mr. Lisitspin, thank you. Thanks to all of you. We appreciate the arguments this morning. The matter is submitted at this time. Thank you so much.
judges: Paez, Korman, Vandyke